UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>EDDIE RAY GRAHAM,<br><br>    Defendant. | Case No. CR 10-013-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Defendant's Motion to Suppress (Docket No. 18). The Court held an evidentiary hearing on the motion on July 19, 2010. For the reasons explained below, the Court will deny the motion.

## FACTUAL BACKGROUND

On December 29, 2009, Sgt. Hoadley of the Caldwell Police Department received a report regarding the theft of a firearm. Shadrack ("Shad") Snow, an individual on misdemeanor probation, was implicated in the theft. At the instigation of the officers investigating the theft, Rick Lopez, Shad's probation officer, conducted a home visit on Shad.

On the morning of December 29, 2009, Lopez called Shad's home, where Shad resided with his Mother, Gloria Snow, his brother, Isaiah, and his Mother's boyfriend,

Eddie Graham.  During the telephone conversation, Lopez informed Snow that he wanted to do a home visit on Shad.  Snow responded that she was leaving to care for her livestock.  Lopez told her to stay home so he could do the home visit.  The specific language used by Lopez and Snow during this conversation is somewhat unclear.  The call was not recorded, and neither Snow nor Lopez could recollect the exact language used.  However, during the evidentiary hearing, Snow testified that Lopez told her that "she could not leave until he completed his probation check."  Lopez's version is not too dissimilar from that of Snow.  He testified that Snow told him they were about to leave, and that he "asked her not to, and . . . said it wouldn't be very long before [he would be] there," and "told her to stick around because [he] wanted to talk to Shad."

Later that morning, Lopez, accompanied by Sgt. Hoadley and at least four other officers, visited Shad's home at 2705 Rawhide Drive.  Two of the officers recorded the visit.  After greeting Snow, Shad and Graham at the residence, Lopez asked if there was anyone else in the home.  Snow responded that her sixteen year old son Isaiah was sleeping in his bedroom.

Lopez then said, "We're going to look around a little bit, ok?"  (Ex. 203, at 1:12.) Lopez and the other officers then began their search.  In Shad's room, Lopez located a .303 caliber round of ammunition.  Lopez and the other officers continued the search for a few more minutes, but did not locate any firearms.  Sgt. Hoadley then asked Snow if there were any guns in the house.  Snow responded that the only guns she owned were kept locked in her bedroom.  Sgt. Hoadley told Snow about the ammunition he found in Shad's

**Memorandum Decision & Order - 2**

room and asked, "Do you mind if I take a look at your guns real quick?"  (Ex. 203, at 8:00.)  Snow responded by asking Graham if he had his keys to the bedroom.  Graham stated that he had locked his keys in the bedroom.  Snow then located her keys and unlocked the door.  Sgt. Hoadley entered the bedroom and examined the guns.  He asked Snow and Graham if either of them owned a handgun.  Both stated that they did not.  The officers exited the bedroom.

Lopez next began searching a desk in an area referred to as the office of the home.  Graham protested the search, suggesting that the officers had no right to search that area.  A dispute over the officers' right to search the area ensued.  During the dispute, Graham stated that he "was on parole and probation . . . too" and was therefore aware of the laws governing probation searches.  (Ex. 203, at 11:02.)  Sgt. Hoadley asked Graham why he was formerly on probation.  Graham told Sgt. Hoadley that he served time for grand theft.

Sgt. Hoadley told Graham that as a convicted felon he could not have firearms.  Graham responded by asking Snow, "Gloria, whose guns are those?"  (Ex. 203, at 13:14.)  Snow replied, "they're mine, do I need to move them?"  Sgt. Hoadley responded, "they can't be in this house," while Graham simultaneously responded, "I guess."  Snow replied, "ok, I'll find somewhere else to put them."  (Ex. 203, at 13:19.)  Sgt. Hoadley then told Graham to "stay back."  Graham responded, "I can exit my office," and Sgt Hoadley replied, "not until we seize the firearms."  (Ex. 203, at 13:22.)  Snow then recovered her bedroom key for a second time, and another officer said, "Ma'am, I'm just going to walk back here with you, ok?"  (Ex. 203, at 13:47.)  Snow responded by saying

**Memorandum Decision & Order - 3**

"ok." (Ex. 203, at 13:48.)

The dispute between Sgt. Hoadley and Graham escalated verbally, and Sgt. Hoadley ultimately placed Graham in handcuffs. The officers then seized four guns from the bedroom, including a .303 bolt-action rifle, a 12-gauge pump-action shotgun, a 12-gauge singleshot shotgun, and .22 bolt-action rifle. After further discussions between Sgt. Hoadley and Graham, Sgt. Hoadley transported Graham to the county jail.

## STANDARD OF LAW

A warrantless search is presumptively unreasonable under the Fourth Amendment to the Constitution, except in limited circumstances. *Kyllo v. United States*, 533 U.S. 27, 31 (2001); *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000), *quoting United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990). The government bears the burden of justifying a warrantless search. *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991).

Here, the government contends that the warrantless search was done with consent. "Consent, when voluntarily granted by someone with authority, is one of the recognized exceptions to the warrant requirement." *United States v. Matlock*, 415 U.S. 164, 170 (1974). In this case, the government contends that Graham's then girlfriend (the two have since married), Gloria Snow, with whom Graham shared the residence, voluntarily consented to the search of their bedroom where the guns were located.

To establish the validity of consent, "the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given." *United States v. Chan-*

**Memorandum Decision & Order - 4**

*Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). Whether the consent was voluntarily given is determined from the "totality of all the circumstances." *Id*. (Internal quotation and citation omitted.) The Ninth Circuit has stated that in general a court should consider the following five factors in determining whether consent was voluntarily given: "(1) whether the defendant was in custody; (2) whether the arresting officer had his guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that he had a right not to consent; and (5) whether the defendant had been told that a search warrant could be obtained." *U.S. v. Vongxay,* 594 F.3d 1111, 1120-21 (9th Cir. 2010). "All five factors need not be satisfied in order to sustain a consensual search." *Id*.

## ANALYSIS

**1. Lack of Custody Weighs In Favor of Consent**

Graham contends that Snow was effectively in custody as defined by Fifth Amendment jurisprudence. He argues that the combination of the phone call from Lopez, the police dominated atmosphere at the residence, and the fact that the officers were acting under color of state law, would cause a reasonable person in Snow's position to believe compliance with the officers' requests were mandatory.

When a "suspect has not formally been taken into police custody, a suspect is nevertheless considered 'in custody' for purposes of Miranda if the suspect has been deprived of his freedom of action in any significant way." *U.S. v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (Internal quotation and citation omitted). In determining

whether a suspect is in custody, the Court must first consider the totality of the circumstances surrounding an interrogation. *Id*. The Court then considers whether a reasonable person in such circumstances would have felt that she was not at liberty to terminate the interrogation and leave. *Id*. Thus, the question of custody for this Court is, taking into account the totality of the circumstances, would a reasonable person in Snow's position have felt deprived of her freedom to the degree that she would not have felt free to terminate the interrogation and not allow the officers in her bedroom.

With respect to the initial phone call, the Court recognizes that Lopez directed that Snow remain at her home until he could conduct his home visit on Shad. However, the Court does not agree with Graham's assertion that the call had a compulsory tenor to it. Although it is not altogether clear what exactly was said during the telephone conversation between Lopez and Snow, it is sufficiently clear that Lopez did not intend to detain Snow. More importantly, a reasonable person in Snow's position would not have interpreted the conversation to mean that Lopez was attempting to detain her. Notably, Lopez was not a patrol officer trying to gain access to Snow's home – he was Snow's son's probation officer. Thus, the more reasonable interpretation for someone in Snow's position would be that Lopez simply needed access to the home and Shad in order to conduct the home visit.

Additionally, the Court does not agree with Graham's contention that the atmosphere at the home was police dominated to the extent that a reasonable person in Snow's

position would have considered herself in police custody.[1]  When determining whether an in-home interrogation is custodial, the Ninth Circuit considers "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'"  *Id*. at 1083.  This determination is fact intensive.  *Id*. at 1084.  Although not exhaustive, the following factors are relevant to the inquiry: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."  *Id*.

With respect to the first factor, the Ninth Circuit in *Craighead* explained that when a large number of law enforcement officers enter a suspect's home, they may fill the home to the extent that there are no police-free rooms to which the suspect may retreat if he wants to terminate the interrogation.  *Id*.  Likewise, when outnumbered by officers, a suspect may feel that he will only encounter another officer if he attempts to leave, or that the officers were specifically brought to prevent him from leaving.  *Id*. At 1085.  If the officers unholster their weapons in the home, the suspect may believe that his home is no longer safe from the threat of police force.  Ultimately, the Ninth Circuit indicated that

---

[1] Indeed, a review of the tape recordings admitted into evidence was critical to the Court's decision.  It clearly indicate a non-coercive environment and does not suggest that Snow's actions or consent were dictated by police conduct or a police-dominated situation.

**Memorandum Decision & Order - 7**

"the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." *Id*.

Based on these considerations, the Ninth Circuit concluded that a person in Craighead's position would have felt that his home was dominated by law enforcement and that they had come prepared for a confrontation. *Id*. In that case, eight law enforcement officers, representing three different law enforcement agencies, entered the suspect's home. All were armed. Some wore protective gear. Some unholstered their weapons. *Id*. Craighead's Air Force superior also accompanied the officers. The Ninth Circuit found it significant that because three separate law enforcement agencies were represented, Craighead did not know whether an FBI agent spoke for all agencies when she told him he was free to leave.

The situation in this case is significantly different. Although the officers, except for Lopez, were armed, there is no evidence that any of them wore protective gear or that any of them unholstered their weapons. Additionally, only four, maybe five officers, including a probation officer, were present in the home. Although not a particularly small number of officers, it is less than the eight in *Craighead*, and they did not represent three separate law enforcement agencies. Moreover, there were four occupants of the home – Snow, her sons Shad and Isaiah, and Graham – so the officers only outnumbered the occupants by one at the most. Thus, the situation was far less compulsory than the situation in *Craighead*. Still, if coupled with other factors supporting a police-dominated atmosphere, these facts could be concerning. However, when considered among the other

**Memorandum Decision & Order - 8**

factors in this case as explained below, the situation is much more benign.

As to the second factor, the Court notes that Snow was never restrained, either by physical force or by threats. When law enforcement agents restrain the ability of the suspect to move, the suspect may feel that he is subject to police domination within his own home and thus not free to leave or terminate the interrogation. *Id*. at 1085. Restraint amounting to custody may be inferred where officers insist on escorting and monitoring the suspect at all times. *Id*.

In *Craighead*, the suspect was escorted to a back storage room where the door was closed behind him. A detective leaned with his back to the door in a way that blocked the suspect from exiting the room. The suspect felt that he could not leave without physically moving the detective or asking him to move. The Ninth Circuit determined that although not everyone in this circumstance would have felt restrained, it was objectively reasonable for the suspect to believe he could not leave.

Nothing of this sort occurred with respect to Snow. Snow was free to move about her home at all times during the search. At one point, an officer did state that he was going to walk back to the bedroom with Snow, but only after she offered to find somewhere else to move her guns. (Ex. 203, at 13:19.) The officer was not escorting Snow; she was freely moving on her own. Moreover, it was more than reasonable for an officer to want to go with Snow after she suggested she was on her way to retrieve firearms.

The third factor involves consideration of whether the suspect was isolated from

**Memorandum Decision & Order - 9**

others.  "The Supreme Court highlighted isolation from the outside world as perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide self-incriminating statements."  *Id*. at 1086-87.  Removal of a suspect from friends, family and colleagues who may lend moral support during questioning is a recurring example of police domination.  *Id*. at 1087.

In *Craighead*, the suspect was taken to "the dark recess of the back storage room where the interrogation took place."  *Id*.  In this case, Snow was not removed from her family and friends.  Snow walked about her home freely.

Finally, the Court considers whether the suspect was informed that questioning was voluntary and that she was free to leave or terminate the interview.  "If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody."  *Id*. at 1087.

In *Craighead*, an officer informed the suspect that he was not under arrest and that he was free to leave, which cut against a finding of custody.  However, other factors, not relevant here, led the Ninth Circuit to conclude that the suspect would still have reasonably believed he was not free to leave, notwithstanding the officer's statement that he was.

In this case, the officers did not inform Snow that she was free to leave or terminate an interview.  This would typically weigh in favor of a finding that Snow was in custody.  However, it is important to note that there was never really any indication that Snow was

**Memorandum Decision & Order - 10**

a suspect in the first place.  In fact, it was clear from the beginning that the subject of the investigation was Snow's son Shad.  Her boyfriend later became a suspect, but at no time would a reasonable person in Snow's position have considered herself a suspect.  Under these circumstances, the officers' failure to inform Snow that she was free to leave is less important because it would be fairly obvious to a person in Snow's position that she was not the object of an interrogation.  In fact, the fact that Snow was not a suspect, generally weighs against a finding that she was in custody.  Therefore, considering the totality of the circumstances, the Court finds that Snow was not in custody.  A reasonable person in Snow's position would not have felt that she was in custody.

### 2. Remaining Factors Weigh in Favor of Consent

The remaining factors the Court must consider in determining whether Snow consented to the search also weigh in favor of a finding of voluntary consent.  First, the officers did not draw their weapons, and the officers did not tell Snow that they could obtain a warrant.  *Vongxay*, 594 F.3d at 1119-20.  Thus, both of these factors do nothing to indicate a lack of consent.

Next, although the officers did not administer Miranda warnings to Snow, Snow was not arrested, so that factor is inapplicable.  *Id.*  The only factor potentially weighing in favor of a finding of no consent is the fact that the officers did not inform Snow of her right to refuse to consent.  However, as noted above, it is significant that Snow was not a suspect and that a reasonable person in her position would not have considered herself a suspect.  Thus, a reasonable person in Snow's position would have known she could

**Memorandum Decision & Order - 11**

refuse consent even if the officers did not specifically inform her of that right.

3.  **Snow Consented to the Search**

Graham also contends that Snow did not consent to the search because she failed to give an actual verbal response to the officer's request to see her guns. Graham argues that Snow simply obeyed the officer's command; she did not consent to entry into her bedroom.

As explained above, after Sgt. Hoadley informed Snow about the ammunition he found in Shad's room, he asked, "Do you mind if I take a look at your guns real quick?" (Ex. 203, at 8:00.) Snow responded by asking Graham if he had his keys to the bedroom. Graham stated that he had locked his keys in the bedroom. Snow responded, "great," located her keys, and unlocked the door herself. (Ex. 203, at 8:13.)

A court may infer consent from the cooperative attitude of the defendant. *U.S. v. Rosi*, 27 F.3d 409, 412 (9th Cir. 1994). Still, it must be "unequivocal and specific" and "freely and intelligently given." *U.S. v. Chan-Jimenez*, 125 F.3d 1324, 1328 (9th Cir. 1997) (Internal quotations and citation omitted).

Here, when the officer asked Snow if he could look at her guns, Snow straight away asked Graham for the keys to their bedroom. Then, upon learning that Graham had locked his keys in the bedroom, Snow immediately located her own keys and unlocked the bedroom herself. (Ex. 203, at 8:13.) These were active and affirmative steps which allowed the officers into her bedroom.

Graham argues that Snow sighed with an exasperated tone, followed by sarcastically

**Memorandum Decision & Order - 12**

muttering "great," when the officer asked her if he could see her guns.  Graham suggests

that this indicates some sort of forced acquiescence to the officer's command.  However,

a review of the audio recording reveals that the officer's tone was not hostile, and there is

no indication that the officer made any authoritative gestures such as placing his hand on

his weapon as was the case in *Chan-Jimenez*. *Id*. at 1328.  A reasonable person in Snow's

position would not have interpreted the officer's question to be a command to see the

guns.  Moreover, Snow does not appear exasperated by anything the officers did.  Instead,

to the extent she is exasperated, it is in response to Graham's statement that he locked his

keys in the bedroom.  The fact remains that upon being asked by the officer to see her

guns, Snow, who was not restrained in any manner, acted freely and intelligently and

immediately stepped into action to let the officers into her bedroom.  Under these

circumstances the Court can infer Snow's consent from her cooperative attitude.  *Rosi*, 27

F.3d at 412.

4.  **Second Search of the Bedroom**

Graham contends that even if the first entry into the bedroom was valid, the second

was not. The second search of the bedroom occurred after Sgt. Hoadley told Graham that

as a convicted felon he could not have firearms. With respect to the five factors for

determining whether consent was voluntarily given, nothing significant had changed

between the time the officers conducted the initial search and second search of the

bedroom.  Snow was not in custody; the officers had not drawn their guns; Miranda

warnings were inapplicable; Snow had not been told she had a right not to consent, but it

Memorandum Decision & Order - 13

was of very little consequence because she was not a suspect; and Snow had not been told that a search warrant could be obtained. Thus, these factors still weigh in favor of a valid consent.

Moreover, Snow's consent to the second search was even more apparent than her initial consent. In response to Graham's question – not an officer's question – about who owned the guns, Snow voluntarily stated that they were hers and voluntarily asked if she needed to move them. (Ex. 203, at 13:19.) Sgt. Hoadley responded, "they can't be in this house," while Graham simultaneously responded, "I guess." Snow replied, "ok, I'll find somewhere else to put them." (Ex. 203, at 13:19.) Only then did Sgt. Hoadley tell Graham to "stay back." Graham responded, "I can exit my office," and Sgt Hoadley replied, "not until we seize the firearms." (Ex. 203, at 13:22.) Snow then recovered her bedroom key for a second time, and another officer said, "Ma'am, I'm just going to walk back here with you, ok?" (Ex. 203, at 13:47.) Snow responded by saying "ok." (Ex. 203, at 13:48.) The officers then removed the guns from the bedroom.

Graham argues that because Sgt. Hoadley had ordered him to stay back until they seized the firearms, the officers were not asking to retrieve the guns; they were telling Snow and Graham that they were taking them. However, a close review of the audio reveals that Snow had already asked if she needed to move the firearms and stated that she would find somewhere else to put them before Sgt. Hoadley told Graham to stay back. Thus, Snow was already in the process of retrieving the firearms for the officers before Sgt. Hoadley told Graham to stay back.

**Memorandum Decision & Order - 14**

No doubt Snow likely realized that if she did not retrieve the guns or allow the officers to retrieve the guns, Graham would be arrested. But the fact remains that the officers already knew the guns were in the bedroom based on the first consented to search, and it would not have been appropriate for them to leave both the guns and Graham in the home once Graham had informed them he had a felony conviction. Sgt. Hoadley informed Graham that he could not exit the office until after they had seized the guns only after Snow made it clear that she was retrieving them. The other officer reasonably accompanied Snow only after she made it clear she was retrieving the guns. Under these circumstances, the Court finds that Snow voluntarily consented to the second entry into the bedroom. Accordingly, the Court will deny the motion to suppress.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendant's Motion to Suppress (Docket No. 18) shall be, and the same is hereby, DENIED.

DATED: **July 22, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order - 15**